Good morning everyone. We're here today for oral arguments. We're going to begin with case 23-3216 United States of America v. Sabaini and Ms. McDonald will begin with oral argument from you. Good morning, your honors. Jackie McDonald on behalf of the defendant Anthony Sabaini. The defendant appeals a seven count conviction on grounds of insufficiency of the evidence following the district court's entry of judgment of guilty on all counts. Today in the time allowed I'll focus on two of those counts, the 2014 unreported income count and the structuring count. For the remaining counts we'll stand in our briefing. Defendant's appeal of the 2014 count turns on two sources of non-taxable income, the coaching reimbursements and the cash inheritance. And the appeal here comes down to a straightforward question. What steps did the government take during its investigation to negate each of these non-taxable sources of income with sufficient evidence? Under Hogan, the government had to conduct a reasonable investigation to ensure thorough analysis when negating these income sources. For good reason, courts have described this burden as rigorous. The government had to prove its case for this count by proving a negative, by showing that these sources of non-taxable income. First, the coaching reimbursements. The government's problem here is that the sum total of its evidence for 2014 is one testifying parent, Mr. Prottle. And that one data point is not robust enough to prove a negative, that reimbursements were not received. Let's compare this investigation to others that courts deem sufficient. In Marenson, the government sought to speak to three categories of folks, friends, relatives, and associates, all related to the relevant time period. But here, the government's limited investigation had almost nothing to do with 2014. The witnesses' testimony documents and parent interviews related to the wrong team for 2014. So we're left with one parent whose child was coached by the defendant in 2014. That's one of 72 parents for 2014. So the jury just did not hear from the other 98% of parents, any one of whom could have said that the reimbursements did occur in 2014. Now, just to clarify that, is there a proof in the record that the reimbursements occurred in that year, or is that just an inference? That's an inference. So it was the government's burden to show that it could not have occurred in 2014, and there is no showing when the reimbursements occurred, but we know through the affidavit and through testimony that it occurred in the indictment period. It was the government's burden to show it was not in 2014, and that was not shown because all we heard from was one parent. So we heard from about 1% of the total pool of people. Is there evidence in the record that sports equipment was purchased in 2014? No, Your Honor. That also was not shown, and again, that was part of the government's burden in its investigation to look at, well, when was the batting cage and anything else purchased, and we do not know. So that was not brought out in the government's investigation. And again, those were all the government's burden to show through its investigation that give that information to the jury, that here's when the batting cage was purchased and similar. Ms. McDonald, looking at it globally in terms of the Little League issue, I hear your point about one parent from 2014, but in the record, many other Little League parents and officials were interviewed by the government. Isn't that correct? That's correct. About 10 to 14 parents were interviewed. The problem is that the 2014 count is a separate count, so all of that parent interview, we either don't know what year those parents relate to, we don't know what year their children were coached by the defendant, and so we can't say that it was not 2014. And that's the government's burden to negate that it could not have occurred in 2014. So it was the government's burden to show it could not have been 2014, and if all of the evidence relates to other years, we just have nothing to say it wasn't 2014. So those are different teams. What happens on Team A may not have happened on Team B. So the team that Mr. Sabini coached, how many players? The parties agreed it was about 36 players for 2014, so that gets us to 72 parents for that year. And so math is not my strong point, but so you're saying 20,000 would have been paid by the parents of 36 players in 2014. It was the government's to show that that did not occur, Your Honor. Yes, correct. And it could have come from a batting cage, it could have come from other reimbursements, but it was the government's burden to show what steps it took under Hogan to show that that did not occur. And again, we don't know what steps the government took that relate to 2014 other than talking to one parent, and one parent is an insufficient data point. So compare this to Marenson, where this court on appeal considered the steps that the government took, the document review that it sought out friends, relatives, and associates, and here the government's investigation just pales. We don't know who they tried to contact, and we know that all that they successfully contacted was one parent. And so too with the document review. The government says that it reviewed documents and stipulations for the relevant period, but again, these are discrete counts, so the government needs to make its proof for each year because that's a separate count. So when we look at the documents, all of them relate to 2015, 2016, 2017. It's the same problem. None relate to 2014. The parent that was interviewed in 2014, did he not have some sort of manager role with the team such that he wasn't just some random parent out of the 36, but a parent who might have more knowledge of what was happening with the team? It was undisputed that his forefront team was for the 2015 team. So that was for the Naperville Little League team, which Mr. Sabini, it was undisputed, did not coach in 2014. So it's as if the only thing we have is him as a parent. We don't have his testimony applying in 2014 as a manager. Are these the types of decisions that are to be respected because they were presented to the jury and they made their call? No, because there's just insufficient evidence. No reasonable jury could find that there's sufficient evidence. The jury instructions on page 29 and 30 presented the government's burden of showing that there was a reasonable investigation. And the jury instructions say if the government does not rule out a non-taxable source, then there is no inference that there was unreported income. So here, the jury was instructed, you have to look at the steps the government took, and we treat these counts as separate counts, and there needs to be sufficient evidence under each count. Let's move a little bit to the inheritance. Is it a problem that the father's will and codicil doesn't make reference to the inheritance? No, Your Honor, because again, the burden is on the government to show what steps it took and how that is a full, robust, and rigorous investigation under its burden to prove a negative. And so the government wants to turn this into a case where if there's some evidence that supports its case, that there was no inheritance, that's enough. But its burden is to show what investigative steps it took. And so it's not enough that there's a little bit or some evidence that supports its case. So when we look at the steps it took, it looked at the documents, so it looked at the mortgage document, looked at the will, looked at the codicil, but the problem is who they did not speak to. So they did not speak to the wives. And that's a problem because the wives of the decedent and the wives of the defendant are potentially the two most important people to speak to. So those are the close confidants of the two most relevant people. Is there anything in the record about how much cash? I don't think I saw anything about how much cash was purportedly left to Mr. Sabini if we believe that account. Yes, it was the equivalent of the sister's college education. And that was introduced through trial testimony. So the parents wanted to essentially cut it even where the sister gets, you know, she was paid her college education and then Mr. Sabini would get the equivalent of that. So for our purposes, you know, it has to be over $20,000 if we're going to look just at the cash inheritance alone. But of course it could be in combination for 2014 of coaching reimbursements and cash inheritance that get us to the $20,000 calculation, which is what the government says is unreported. So further with the cash inheritance, you know, if we look at Marenson, the government sought to speak to friends, relatives, and associates. And here because the government has a burden to prove a negative, it has to show that it conducted a robust, rigorous investigation. Yes, Your Honor. Here, though, when the government has gone out and established that the father had limited means before he passed away, family members indicated that they didn't think he had a significant amount to pass on, why is that not enough? There's always one more person that the government could have spoken with. Why isn't the initial burden met? And it's up to the jury. The initial burden isn't met because, you know, we look at two people that they spoke to at the exclusion of the two most important and at the exclusion of other extended family members. And we don't even have through stipulation or through government testimony that the government spoke to anyone else but two people. And that was its burden to show, you know, we did speak to more than two people. For instance, maybe those are the only two extended family members. Well, the government should have introduced that evidence so that the jury knows, well, we checked, we reasonably checked the box on extended family members. Did we reasonably check the box on the friends of the decedent? No, zero friends were talked to. Friends of the defendant? No, zero friends of the defendant were talked to by the government. So the initial burden is not met because, you know, while there is no hard line on the volume or percentage of folks that you need to speak to, two people is so far from what we have in Marenson where it's, you know, categories of peoples, friends, relatives, associates. We have a volume of people and we're not excluding anyone important. There wasn't an asterisk in Marenson that, you know, we didn't actually speak to these two important people, but we spoke to everyone else and that was enough. And that brings me then to the structuring count. For this charge, the government had to show knowledge and intent to structure, and I'll focus on the intent proof here. The government's problem comes down to all the concessions it made about its lack of evidence proving intent. The government concedes that only one of seven of the monograph factors for a structuring conviction is met, and that screams reasonable doubt. So by the government's own admission, we have minimal evidence of indicators of structuring. No false names, no false information on the account, no unusual withdrawals, no runners, no unusual payments, and no multiple accounts. Again, that alone screams reasonable doubt. Would you like to reserve the remainder of your time? Yes, Your Honor. Very good. Thank you. Thank you, Ms. McDonald. We'll now move Mr. Haston to you. May it please the Court. Good morning. Jared Haston on behalf of the United States. Viewing the evidence in the light most favorable to the government, the defendant's convictions should be affirmed. Your Honors, I'm going to focus my argument on the two points that defense counsel raised, and I will stand on the briefs for the rest of the arguments presented in the government's response. First of all, with the tax counts, the defendant was convicted for filing false tax returns for tax years 2014 through 2018. This case turned on what's called cash hoard defense. The defendant had a bank account in his name that he deposited $250,000 into for the course of 162 deposits between 2014 and 2018. He had no explanation for that cash. During the government's investigation, the defendant provided an affidavit to the government trying to explain non-taxable sources of where that cash came from. Number one, and the defendant was not specific in this affidavit, and that was deliberate, and that's what the proof of trial showed, and that the defendant deliberately tried to obscure where the cash came from because it was all false. Every single piece of it, the Little League reimbursement, the inheritance, all of it was. Starting with the Little League reimbursement, the government receives the defendant's affidavit. The government also receives the defendant's mother's affidavit, which is silent about Little League reimbursements, but let's focus on Little League reimbursements. The government went out and spoke to 10 different parents on various teams that the defendant managed between 2014 and 2018. In his affidavit, the defendant never specified which year he received upwards of $20,000. This was also in the record as well. This was presented to the jury in the year 2014. Two parents actually testified at trial. Ten parents were interviewed. The two parents were Ryan DeBorah and Tim Prodell. This evidence also showed, and it was presented to the jury, that these were five-year-olds. This was a T-ball team. Neither Mr. Prodell nor Mr. DeBorah ever recalled presenting any sort of reimbursement, let alone nowhere near $20,000, to Mr. Sabini, the defendant. The court instructed the jury that with respect to the defendant's burden to establish or to investigate all reasonable leads, that those reasonable leads needed to be plausible. In sum, Your Honors, this was a question for the jury with respect to did the government check all leads to non-taxable income reasonably susceptible of being followed? And again, too, it was a question presented to the jury. There was more than enough evidence. And the government also presented evidence with respect to other tax years as well. Stipulations from various teams that the defendant's children played in that the defendant didn't necessarily coach. The government also subpoenaed records from sports facilities, multiple sports facilities, the Naperville Little League, trying to determine is there any evidence anywhere showing, corroborating the defendant's statement in his affidavit, that he was paid $20,000 for managing Little League teams for children whose age ranges for those teams ranged between 5 and 8 years old. And the jury was also allowed to use the common sense here that the jury instruction said plausible. This affidavit and the government introduced this affidavit in its case in chief and went about discrediting it throughout its case in chief. The Little League reimbursements were one part of it, but the government argued at trial that if one part of this affidavit is false, the other parts of this affidavit are false as well. And that turns to the cash and the gold coin defense. And there's something that's notable, I think, that the defendant does in his reply brief. They state that the gold coins are not at issue in this appeal. It's on page 4 of the reply brief. That's not what happened at trial, though. The defendant's affidavit made note of receiving gold coins from his deceased father, even though there's no mention of this at all, in a will, a will codicil, anywhere. The government went out and tried to find evidence of the defendant selling coins for cash. They interviewed 50 different coin dealers in the states of Indiana, Wisconsin, Illinois, Illinois, trying to find any records of the defendant selling coins for cash. The defendant finally gave four names of coin dealers where he purportedly sold coins for  The government called all of those coin dealers. In its case in chief, they had no records at all of the defendant selling gold coins for cash. The defendant also put on a defense here. He testified that the gold coins had dates on them that were factually impossible. He testified that the gold coins had dates on them from the 1970s. But those gold coins, as the government showed in its rebuttal case, weren't minted until 1986. That's another lie that was proved up at trial. And again, too, it's important where if the defendant's lying about one thing in his affidavit, the jury was entitled to believe that he was lying about other things in his affidavit. Was there a falsis ad nuno, falsis ad omnibus jury instruction given? I'm sorry, Your Honor. Was there an instruction given to that effect, falsis ad nuno, falsis ad omnibus, if you lie about one thing, the jury could conclude that you lied about other things? There wasn't a specific instruction, Your Honor, but it's something that the government argued in closing argument, and it's a rebuttal argument, too, that the affidavit, the affidavit that the defendant presented to the government, that the government reasonably investigated, they ran down all reasonable leads, that if one part of it's false, that you, the jury, have the ability to disbelieve all of it. Again, it comes down to the common sense argument that the government made to the jury that if the defendant's lying about one thing in his affidavit, he's lying about other things in his affidavit as well, and he's lying about this because he has no explanation for where this excess cash comes from. Your Honor, another key piece of evidence that the government presented in its case, and I want to go back to this reasonable leads argument, is a question, a fact for the jury, and the jury was instructed on it, was that there was evidence that the government actually culled the defendant's instructor from the Federal Law Enforcement Training Center, which is where new federal agents go to receive training. The defendant received training on money laundering. The government introduced a PowerPoint that the defendant received at this training, and the government also culled that instructor, Hal Manning. Mr. Manning testified that he taught the defendant on things such as cash hoard defenses, the same, the issue that's in this case, and the defendant was taught at Law Enforcement Training Academy that the number one defense to this cash hoard type of an investigation is for a defendant to claim that he received cash from a dead relative. The government also presented that evidence to the jury, showing that this is exactly what the defendant in this case was doing, and further to that point, he was taught on how to do it, and he was taught that this is a very difficult thing for the government to essentially disprove, a dead relative who's no longer alive, who can't corroborate or refute these statements, saying that that's where this excess cash comes from. The defense also notes that the government didn't talk to enough people with respect to the cash inheritance. I want to focus on Mr. Sabini's sister's testimony. The government called more than two witnesses. The government called Mr. Sabini's sister, Mr. Sabini, the defendant's brother-in-law, and the defendant's uncle, the defendant's father's brother. All of them testified that they were not aware of the defendant's father having a cash or coin hoard that he was planning on giving to Mr. Sabini, and they all testified, and this was properly before the jury, that they weren't aware of that fact. Mrs. Sabini, the defendant's sister, also testified, excuse me, Ms. Hampton, Angela Hampton, testified that she received a grand jury subpoena, and she spoke with the defendant about that grand jury subpoena, and he tried to get her to lie to the grand jury and to the government about what their father had left him. That evidence was also before the jury. It's a witness, Ms. Hampton, saying that their father did not have these assets, did not leave these assets to the defendant, and when Ms. Hampton was subpoenaed to testify in front of a federal grand jury, that the defendant asked her or pressured her to lie for him. That evidence was also before the jury, and the government argued it, and the jury was free to conclude that, again, the whole idea of these cash, coins, Little League reimbursements, the defendant's trying to get his sister to lie for him because it didn't happen. It goes back to what the jury instructed him was, that these have to be plausible explanations. The jury was free to discredit the affidavit and find and conclude that the defendant's basis for this excess cash came from was simply made up. It was not plausible. Your Honor, I was going to move to the structuring count, but before I did so, I wanted to make sure that there were no further questions with respect to the indirect methods. The structuring count, Your Honor, Your Honors, the defendant relies on a circular, a monograph established by the, put out by the Department of Justice with respect to various hallmarks of what constitutes structuring. One of those hallmarks was present in this case, the artificial deposits, excuse me, the artificial structuring of deposits lower than $10,000. We have a case here and the jury was presented with this evidence of a defendant who was a federal agent who was trained in money laundering, taught money laundering. The government retrieved PowerPoints from the defendant's computer that had information on it about structuring. This was a defendant who the jury could reasonably conclude knew what structuring was. He was trained on it. He was taught on it. Between 2014 and 2018, there were 162 cash deposits into a bank account. The evidence showed it was opened up in 2014, shortly before the first deposit was made. None of those deposits was over $10,000. Most of the deposits were done at a drive-through ATM at a Fifth Third Bank. Revenue agent Michael Welch testified that an explanation for that is that the defendant didn't want to go inside a bank and didn't want to interact with tellers because that could raise a suspicion. The defendant's deposits went even lower in April 2016 after the defendant deposited three different deposits that were counted on the same day, April 25th, 2016, a CTR, a Currency Transaction Report, was filed that day because the defendant filed three different deposits that hit that $10,000 threshold. A CTR was filed and the deposits went even lower after that. The jury was also presented with information that the deposits stopped after the defendant learned he was under investigation in the fall of 2018. There was no more activity in that bank account once the defendant learned that he was under investigation. And another key fact that the jury heard, and it pertains to all the counts of conviction, including the structuring counts of conviction, is the defendant deleted his phone once he learned that he was under criminal investigation. Steps that somebody, had they not been doing something wrong, normally wouldn't take. Again, Your Honors, the evidence sufficiently showed that the defendant was keenly aware of what structuring was and that his conduct over the course of four years, depositing $250,000 into a bank account, none of which, none of those deposits were in excess of $10,000. That is structuring. The jury was entitled to consider that. Your Honor, there was sufficient evidence for the jury to arrive at their conclusion. Your Honor, unless the court has any further questions, for the reasons stated here today and for the reasons in our brief, the government respectfully requests that this court affirm the defendant's convictions. Thank you, Mr. Aston. Ms. McDonald, we'll move back to you now for rebuttal argument. Your Honors, for the 2014 count, the government had to negate all non-taxable sources of income. So that included the coaching reimbursements and the cash inheritance. 2014 is a unique count and required its own category of proof. So the government seems to rest on disproving reimbursements with one data point, one parent of 72, Mr. Prottle. That's no documents and no parent interviews that I can show tied to 2014. If the government could redo its investigation, it would probably figure out which team Mr. Sabini coached in 2014. It didn't do that. It would find a roster of the athletes on those teams. It didn't do that. And it would contact at least one of the parents of each of the children. And it didn't do that, from what we know. And so, too, with the cash inheritance. If the government could redo its investigation, it would include the wives into its investigation. It would tell the jury, we spoke with the wives and here's what they said. The defense may also call them, but we at least incorporated the wives into our investigation. For the structuring count, we should look at the transaction amounts. In all of the cases that we provide before the Seventh Circuit, and even in the case that the government provides, the transaction amounts are in the $9,000 range. So they're just below the $10,000 reporting. Here, by the government's own calculation, we have transaction amounts in the $1,000 and $2,000 range. For these reasons, the defendant asks for reversal. Thank you. Thank you, Ms. McDonald. Your court appointed counsels. You have the great thanks of the court, both to you and your firm, for all your work on the case. And thank you, as well, Mr. Haston, for your advocacy, both in writing and orally. The case will be taken under advisement.